**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| AARON KILLGORE, <br>     *Plaintiff-Appellant*, <br><br> v. <br><br> SPECPRO PROFESSIONAL SERVICES, LLC, <br>     *Defendant-Appellee*. | No. 21-15897 <br><br> D.C. No. <br> 5:18-cv-03413-EJD <br><br><br> OPINION |

Appeal from the United States District Court
for the Northern District of California
Edward J. Davila, District Judge, Presiding

Argued and Submitted July 13, 2022
Pasadena, California

Before: Mark J. Bennett and Gabriel P. Sanchez, Circuit
Judges, and Elizabeth E. Foote,[*] District Judge.

Opinion by Judge Sanchez

_____

[*] The Honorable Elizabeth E. Foote, United States District Judge for the
Western District of Louisiana, sitting by designation.

# SUMMARY[**]

### California Law / Employment Matters / Environmental Law

The panel affirmed in part and reversed in part the district court's summary judgment in favor of plaintiff's former employer, SpecPro Professional Services, LLC, on plaintiff's retaliation and wrongful termination claims.

While he was consulting on an environmental project for the U.S. Army Reserve Command, plaintiff believed he was required to prepare an environmental assessment in a manner that violated federal law. Plaintiff was terminated after reporting the suspected illegality to the client and his supervisor, William Emerson, at SpecPro. Plaintiff brought statutory and common law claims of retaliation and wrongful termination in a California state court action that was removed to federal court.

Plaintiff alleged his employment was terminated in violation of the California Whistleblower Protection Act, Cal. Labor Code § 1102.5(b), (c). The panel first addressed the district court's determination that plaintiff's disclosures to his supervisor were not actionable because the supervisor was not "a person with authority over the employee or another employee who has the authority to investigate, discover, or correct the violation or noncompliance." The district court determined that plaintiff's disclosures to the supervisor were immaterial and insufficient as a matter of law to establish a whistleblower violation under section

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

1102.5(b).  Although the Supreme Court of California has not addressed the issue, the panel concluded that the district court misconstrued the provision.  The panel held that plaintiff's disclosures to his supervisor—as a "person with authority over the employee"—provided an independent ground for asserting a whistleblower retaliation claim under section 1102.5(b).  Such a construction was consistent with the broad remedial purpose of the California Whistleblower Protection Act.  The panel predicted that the California Supreme Court would hold that section 1102.5(b) prohibits employers from retaliating against employees who disclose wrongdoing to any one of several enumerated avenues.  Because the district court wrongly concluded that disclosures to the supervisor were not protected under the whistleblower statute, it did not consider this evidence in ruling on SpecPro's motion for summary judgment.  The panel concluded that the evidence created a genuine dispute of material fact as to whether SpecPro retaliated against plaintiff for engaging in protected whistleblower activity.

The district court also disregarded plaintiff's disclosures to Army Reserve project leader Chief Laura Caballero because: (1) disclosing potential violations to Caballero was not a protected activity because it was a part of the "normal duties" of his employment; and (2) plaintiff's disclosures were unprotected because Caballero was assertedly a "wrongdoer" in the alleged noncompliance with the National Environmental Policy Act ("NEPA"), and, therefore, Caballero's own wrongdoing was not a "disclosure" to her.  The panel held that both determinations rested on a misapplication of California law.

First, the panel held that the district court presumed, without explaining why, that Caballero was plaintiff's supervisor with authority over him.  The record does not support that supposition.  Plaintiff's disclosures to her were properly understood as a disclosure to a "government

agency" under the plain language of the statute. Cal. Lab. Code § 1102.5(b). Section 1102.5(b), as amended in 2014, provides that a whistleblower's disclosures are protected regardless of whether the disclosure was part of the employee's normal duties. The panel held that plaintiff's discussions with Caballero of potential violations of NEPA were clearly protected under state whistleblower law at the time they were made. Second, the panel held that several state court appellate courts have held that disclosures to wrongdoers are protected under section 1102.5(b). The district court court's reliance on *Mize-Kurman v. Marin Community College District*, 136 Cal. Rptr. 3d 259 (Ct. App. 2012), was inapt. The panel held that the district court misapplied California law when it rejected evidence of plaintiff's disclosures to Caballero. The panel further held that plaintiff raised genuine issues of material fact as to whether he disclosed potential violations of law to Caballero and whether such disclosures were a contributing factor in his termination in violation of state law.

Next, concerning the section 1102.5(b) claim, the panel addressed whether plaintiff reasonably believed that the information disclosed a violation of a federal statute or noncompliance with a federal rule or regulation. In other words, did plaintiff reasonably believe that NEPA was being violated in the preparation on an environmental assessment for a proposed action by the 1-158th Assault Helicopter Battalion to modify the use of landing sites on land owned by the Texas Department of Criminal Justice near Conroe, Texas ("Conroe EA"). The district court held that plaintiff could not have reasonably believed that omission of the prior helicopter operations from the Conroe EA was a violation of NEPA and its regulations because the EA was a "forward looking" document that need only assess the potential impacts of the proposed action. The panel held that the district court misconstrued the holding in *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989 (9th

Cir. 2004). The panel held that the district court's assertion that the EA was only a "forward looking" document that need not consider prior activity was contradicted by the Council on Environmental Quality regulations and precedent. As plaintiff's testimony and evidence identified, the Conroe EA provided no analysis or discussion of the prior helicopter activities. The cumulative effect of these prior activities, when combined with the proposed assault helicopter landing zone operations, could have significant effect on the environment. The panel concluded that the district court erred in determining, as a matter of law, that plaintiff had no reasonable cause to believe that they were evaluating NEPA by failing to consider and include the prior helicopter operations in the Conroe EA.

The panel addressed two remaining matters on the section 1102.5(b) claim. First, viewing the evidence in the light most favorable to Plaintiff's claims, the panel held that plaintiff's concern about the inability to meet the three-month deadline reflected a broader concern that the team was being forced to prepare a noncompliant report that unlawfully excluded the prior helicopter operations; and the reasonableness of his belief was a factual question for the jury to determine. Second, the panel rejected SpecPro's assertion that plaintiff could not have reasonably believed there was a violation of NEPA because such violation can only occur when the EA was signed, and plaintiff was fired before the Conroe EA was completed. This argument was contradicted by the plain language of the statute.

The panel concluded that plaintiff's disclosures to his supervisor and Caballero were protected under section 1102.5(b), and he raised genuine issues of material fact as to what illegal conduct he disclosed, whether he had reasonable cause to believe that federal law was being violated, and whether his whistleblowing activity was a contributing factor in his termination of employment. The panel reversed

the district court's summary judgment order on the section 1102.5(b) retaliation claim. Because his claim of wrongful termination in violation of public policy was derivative of his retaliation claim, the panel also reversed the grant of summary judgment on that claim.

Concerning plaintiff's section 1102.5(c) claim, the panel agreed with the district court's grant of summary judgment after finding that plaintiff presented no evidence he had refused to engage in illegal activity. One of the elements of this claim requires a determination whether the plaintiff was retaliated against for refusing to participate in the identified activity. While plaintiff raised extensive concerns about the report, no evidence was adduced that plaintiff refused to comply with Caballero's directives concerning the Conroe EA or otherwise refused to complete the EA. The panel therefore affirmed the district court's summary judgment for SpecPro on this claim.

## COUNSEL

Henry Harmeling IV (argued), Law Office of Henry Harmeling IV, Cardiff, California; Geoffrey C. Lyon, Lyon Law PC, Long Beach, California; for Plaintiff-Appellant.

Amy Todd-Gher (argued) and Denise Tran-Nguyen (argued), Littler Mendelson P.C., San Diego, California; Adam E. Brauner; for Defendant-Appellee.

**OPINION**

SANCHEZ, Circuit Judge:

Plaintiff Aaron Killgore appeals the district court's grant of summary judgment for his former employer, Defendant SpecPro Professional Services, LLC ("SpecPro"). While consulting on an environmental project for the United States Army Reserve Command, Killgore believed he was being required to prepare an environmental assessment in a manner that violated federal law. He was terminated shortly after reporting the suspected illegality to the client and his supervisor at SpecPro. He brought statutory and common law claims of retaliation and wrongful termination in a state court action that was removed to federal court.

We conclude the district court misapplied the substantive law of California. The court determined in error that Killgore's disclosures were not protected under the state whistleblower statute and therefore disregarded evidence material to his claims. Properly considered, the evidence raises genuine disputes of material fact as to the nature of Killgore's disclosures, whether he had reasonable cause to believe that federal law was being violated, and whether his whistleblowing activity was a contributing factor in his termination of employment. We reverse the district court's entry of summary judgment as to claims of retaliation and wrongful termination that are based on his protected disclosures. However, we affirm as to his claim of retaliation based on the refusal to participate in illegal activity, as Killgore presented no evidence in support of that claim.

**I.**

Defendant SpecPro is an environmental services firm that assists government agencies with the preparation of environmental assessments and other reports required under the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.* and federal regulations. SpecPro contracted with the United States Army Reserve Command ("Army Reserve") to provide environmental and training support services for the 63rd Regional Support Command ("63rd Command"), headquartered in Mountain View, California. One of the projects under contract involved preparing an environmental assessment for a proposed action by the 1-158th Assault Helicopter Battalion ("1-158th") to modify the use of twelve landing sites on land owned by the Texas Department of Criminal Justice near Conroe, Texas ("Conroe EA"). The 63rd Command proposed designating the Conroe site as a staging area for Blackhawk helicopter assault training missions, which would require the aircraft to land and be supported by refueling trucks and personnel. Previously, the 1-158th performed Apache helicopter attack missions which involved hovering rather than landing maneuvers at Conroe.

Aaron Killgore was hired by SpecPro in June 2015 as a program manager and assigned to support the Conroe EA.[1]

---

[1] SpecPro was initially asked to prepare a Record of Environmental Consideration ("REC"), a statement that "briefly describes the proposed [Army] action and timeframe . . . and clearly shows how an action qualifies for a [Categorical Exclusion]." 32 C.F.R. § 651.19. Proposed actions may be excluded from compliance with NEPA if "they do not individually or cumulatively have a substantial effect on the human environment." 32 C.F.R. § 651.11(c). The REC was submitted March 2017 and proposed that no environmental assessment be undertaken, but the 63rd Command denied the request and in April 2017 directed the completion of the Conroe EA.

SpecPro's team included Killgore, Oskar Burger, and Killgore's supervisor, William Emerson. SpecPro also retained AGEISS, an environmental consulting company, to assist in preparing the Conroe EA, and AGEISS assigned Melissa Russ to the contract. The Army Reserve's project leader was Chief Laura Caballero, the Environmental Division Chief of the 63rd Command.

During the SpecPro team's environmental due diligence, Killgore learned that the Army Reserve had already been using the Conroe site to run helicopter attack training missions for more than a decade. Killgore testified that he had traveled to Fort Bragg and spoken to an Air Force pilot who mentioned there had been prior refueling exercises at Conroe, which indicated to him that helicopters previously landed in an assault battalion and were refueled by ground vehicles. Burger was told by "one of the guys at Conroe" that there had been many low-level flying and training exercises at Conroe for very long time, possibly since the 1990s.

The prior helicopter activity at Conroe raised several concerns for the SpecPro team in its evaluation of environmental impacts. SpecPro was unable to locate any lease agreement authorizing the Army Reserve to use state land for helicopter operations or describing the permissible scope of such activity. No environmental condition of property report had been requested to determine if there were prior oil spills or refuelings at Conroe, as is typical when the Army leases or acquires property and must determine any environmental liabilities. No endangered species report had been prepared or requested of state agencies to determine if prior operations had disrupted endangered or state-sensitive species. No soil samples had been taken to test for oil spills or soil erosion caused by motorized vehicles, biological surveys to determine if invasive plant species had been

introduced by human activity, cultural surveys to ascertain any impacts on Native American land or artifacts, or storm water, pollution, or aviation management surveys to determine other possible environmental effects by low-level flight operations.

After SpecPro was assigned the Conroe EA in April 2017, Chief Caballero informed SpecPro that the report would need to be completed in three months to permit helicopter training operations scheduled for August 2017 to proceed. Killgore, Burger, and Russ expressed concern to her over the abbreviated timeline, explaining that environmental assessments often required nine to eighteen months of work and the prior helicopter operations added greatly to the complexity of the project. Killgore separately communicated to Emerson that the timeline was unreasonably short given its complexity and how little was documented or known about the prior training missions.

Another point of contention arose when Chief Caballero instructed the SpecPro team around May 2017 to remove or refrain from referencing the past helicopter activity from the Conroe EA. Chief Caballero directed Killgore to tell his team not to send emails or keep a written record of the prior use issues surrounding the Conroe EA. SpecPro was not allowed to pull environmental reports detailing the history of the Conroe parcels or visit the Conroe site to observe its actual conditions. Chief Caballero stated that prior operations were not relevant to an environmental assessment under NEPA because the proposed government action involved helicopter landings, not helicopters hovering above ground. Chief Caballero testified that the instruction to omit prior helicopter activity from the Conroe EA came from her superiors in the Army Reserve.

Killgore and Russ strongly disagreed with this directive. Killgore told Chief Caballero that failing to report the prior helicopter training activities in the Conroe EA was a violation of NEPA and federal regulations. Russ separately shared with Killgore that omitting all mention of past activities was "unethical and probably illegal" because they were not being fully transparent with the public about the nature of the proposed action, and she wanted her name removed from the assessment if the prior trainings were not addressed.

Following these conversations, Chief Caballero called Emerson, Killgore's supervisor at SpecPro, to raise concerns about Killgore's "pushback on the Conroe EA." Emerson conveyed Chief Caballero's dissatisfaction to Killgore. Killgore responded that he "didn't have the information [the team] needed to complete this document accurately," such as "cultural, endangered species, erosion, property, and pollution-related" information. Emerson told Killgore to "do what the client asked" and "finish the environmental assessment in three months." Killgore contends that he discussed with Emerson the "legality" of the Army Reserve's instruction to "hide the . . . past operations associated with these helicopter [trainings]." Killgore expressed concern that there were "multiple violations" of NEPA because "we were directed to not be transparent about [past operations]" and "we weren't allowed to send people on the ground to inspect the parcels." Emerson emphasized that their "goal is to keep [Chief Caballero] happy so that we can get the option year renewal in 2018 and the award again in 2019."

Despite Chief Caballero's directive, Russ and Burger included several oblique references to the prior helicopter operations in the draft Purpose and Need statement, and Description of Proposed Action and Alternatives (DOPAA)

chapters, writing that the proposed action was "a transfer of helicopter battalion from [attack to assault]." Chief Caballero approved the draft without reading it, and Burger sent it to the 63rd Command. Upon learning that Burger had included these references in the draft, Chief Caballero immediately instructed the SpecPro team to take them out.

Chief Caballero communicated to Emerson her "serious concern that [Burger] did not follow specific guidance and instruction from leadership" and suggested that Killgore had encouraged him to disobey. Emerson directed Killgore to apologize to Chief Caballero for his disobedient attitude and for Burger's conduct, stating "[SpecPro] needs to approach [Chief Caballero] and her instructions with a 'yes' attitude even if priorities/goals shift wildly as long as directives are legal, moral, and ethical and exist within our scope." Killgore and Burger both apologized to Chief Caballero.

On June 22, 2017, Chief Caballero met with Emerson and Dr. Stephen Alexander, the general manager of SpecPro, at a regularly scheduled meeting. Caballero expressed deep dissatisfaction with Killgore's lack of cooperation in the Conroe EA and his performance in other work-related matters. Dr. Alexander described it as "the worst client meeting [he] ever had." That afternoon, Emerson fired Killgore for failing to meet company and customer expectations.

SpecPro completed the Conroe EA in September 2017, which at the time of submission made no mention of the prior helicopter activities in its Purpose and Need and DOPAA chapters. Russ stated that after the firing, the SpecPro team understood that "this was [the Army Reserve's] document, so we'll write it the way they want it." While Russ continued to have concerns that the Conroe EA had not been fully transparent about the proposed action, her

position softened after seeing the Army Reserve's extended public outreach.

In May 2018, Killgore filed an action in the Santa Clara County Superior Court alleging state law claims of unlawful retaliation in violation of the California Whistleblower Protection Act, Cal. Lab. Code § 1102.5(b), (c), wrongful termination in violation of public policy, and failure to pay wages due upon termination, Cal. Lab. Code §§ 202-203. SpecPro removed the action to federal court on the basis of diversity jurisdiction. On December 19, 2019, the district court granted SpecPro's partial motion for summary judgment as to retaliation and wrongful termination. The parties resolved the wages claims by joint stipulation. Killgore timely appealed the district court's judgment.

## II.

We review *de novo* a district court's order granting summary judgment. *Botosan v. Paul McNally Realty*, 216 F.3d 827, 830 (9th Cir. 2000). We "must determine whether, viewing the evidence in the light most favorable to the nonmoving party, there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000) (en banc).

We review *de novo* the district court's interpretation of California law. *Judd v. Weinstein*, 967 F.3d 952, 955 (9th Cir. 2020) (citing *Salve Regina Coll. v. Russell*, 499 U.S. 225, 231 (1991)). Absent controlling authority from the state supreme court, "a federal court must 'predict how the highest state court would decide the [state law] issue using intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises, and restatements as guidance.'" *Kaiser v. Cascade Cap., LLC*, 989 F.3d 1127,

1131-32 (9th Cir. 2021) (brackets in original) (quoting *Judd*, 967 F.3d at 955-56).

**III.**

Killgore asserts that his termination of employment violated the California Whistleblower Protection Act because he was retaliated against for disclosing what he reasonably believed to be violations of federal law and regulation in the preparation of the Conroe EA, and because he was fired for refusing to participate in illegal activity. Cal. Lab. Code § 1102.5(b), (c) (collectively "section 1102.5"). Killgore further alleges a claim of wrongful termination in violation of public policy that is derivative of his statutory retaliation claims.

As the California Supreme Court recently explained,

> Section 1102.5 provides whistleblower protections to employees who disclose wrongdoing to authorities. As relevant here, section 1102.5 prohibits an employer from retaliating against an employee for sharing information the employee "has reasonable cause to believe . . . discloses a violation of state or federal statute" or of "a local, state, or federal rule or regulation" with a government agency, with a person with authority over the employee, or with another employee who has authority to investigate or correct the violation.

*Lawson v. PPG Architectural Finishes, Inc.*, 12 Cal. 5th 703, 709 (2022) (ellipsis in original). "An employee injured by prohibited retaliation may file a private suit for damages" against his former employer. *Id.*

To assert a claim for whistleblower retaliation in violation of section 1102.5,

> the plaintiff [must] establish, by a preponderance of the evidence, that retaliation for an employee's protected activities was a contributing factor in a contested employment action. . . . Once the plaintiff has made the required showing, the burden shifts to the employer to demonstrate, by clear and convincing evidence, that it would have taken the action in question for legitimate, independent reasons even had the plaintiff not engaged in protected activity.

*Vatalaro v. Cnty. of Sacramento*, 294 Cal. Rptr. 3d 389, 398 (Ct. App. 2022) (ellipsis in original and quotation marks omitted) (quoting *Lawson*, 12 Cal. 5th at 718). Under *Lawson*, California courts must evaluate section 1102.5 claims under the governing framework set forth in section 1102.6 of the Labor Code, not the three-part burden shifting framework under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Lawson*, 12 Cal. 5th at 718.

## A.

We first address the district court's determination that Killgore's disclosures to his supervisor Emerson were not actionable because Emerson was not "a person with authority over the employee or another employee who has the authority to investigate, discover, or correct the violation or noncompliance." Although the district court accepted that Killgore had discussed the potential illegality of the Conroe EA with Emerson, the court determined that Killgore's disclosures to Emerson were immaterial and insufficient as

a matter of law to establish a whistleblower violation under section 1102.5(b).

Section 1102.5 provides in relevant part:

(b) An employer, or any person acting on behalf of the employer, shall not retaliate against an employee for disclosing information, or because the employer believes that the employee disclosed or may disclose information, to a government or law enforcement agency, to a person with authority over the employee or another employee who has the authority to investigate, discover, or correct the violation or noncompliance, or for providing information to, or testifying before, any public body conducting an investigation, hearing, or inquiry, if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation, regardless of whether disclosing the information is part of the employee's job duties.

(c) An employer, or any person acting on behalf of the employer, shall not retaliate against an employee for refusing to participate in an activity that would result in a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation.

Cal. Lab. Code § 1102.5.

In interpreting a state statute, we must follow the state's rules of statutory interpretation, here California. *Bass v. Cnty. of Butte*, 458 F.3d 978, 981 (9th Cir. 2006). "As in any case involving statutory interpretation, our fundamental task here is to determine the Legislature's intent so as to effectuate the law's purpose. We begin by examining the statute's words, giving them a plain and commonsense meaning." *People v. Gonzalez*, 2 Cal. 5th 1138, 1141 (2017) (alterations and quotation marks omitted) (quoting *People v. Scott*, 58 Cal. 4th 1415, 1421 (2014)). "We consider the language in the context of the entire statute and the statutory scheme of which it is a part, harmonizing provisions relating to the same subject matter, to the extent possible." *Satele v. Super. Ct.*, 7 Cal. 5th 852, 858-59 (2019) (citations omitted). "If possible, significance should be given to every word, phrase, sentence and part of an act in pursuance of the legislative purpose." *Renee J. v. Super. Ct.*, 26 Cal. 4th 735, 743 (2001). "When the language is clear and there is no uncertainty as to the legislative intent, we look no further and simply enforce the statute according to its terms." *Id*.

Although the Supreme Court of California has not addressed what constitutes a protected disclosure under section 1102.5(b), we conclude that the district court misconstrued this provision. The court concluded that Emerson, as a private citizen in the employ of a private environmental compliance firm, lacked the power to correct the Army Reserve's alleged noncompliance and therefore disclosing these matters to him was "irrelevant under [section] 1102.5(b)." In doing so, the court interpreted section 1102.5(b) to mean that a protected disclosure must be made to "a person with authority over the employee" *who also* has the authority to "investigate, discover, or correct" the violation.

However, California courts apply the "last antecedent rule" when interpreting statutes. *See White v. Cnty. of Sacramento*, 31 Cal. 3d 676, 680 (1982) ("A longstanding rule of statutory construction—the 'last antecedent rule'—provides that 'qualifying words, phrases and clauses are to be applied to the words or phrases immediately preceding and are not to be construed as extending to or including others more remote.'" (quoting *Bd. of Port Cmm'rs of City of Oakland v. Williams*, 9 Cal. 2d 381, 389 (1937))). Applying that statutory canon here, the clause "who has the authority to investigate, discover, or correct the violation or noncompliance" modifies only the immediately preceding phrase—"another employee." Accordingly, Killgore's disclosures to Emerson—as a "person with authority over the employee"—provided an independent ground for asserting a whistleblower retaliation claim under section 1102.5(b).[2]

Several persuasive California sources support this reading of the statute. California Civil Jury Instruction 4603, the model instruction that describes the elements of a whistleblower retaliation claim under section 1102.5(b), draws a distinction between disclosures to a "person with authority" over the plaintiff and disclosures to "an employee with authority to investigate, discover or correct" the

---

[2] Even if the district court were right that the clause "who has the authority to investigate, discover, or correct" modifies the entire sentence, "[s]uch use of the word 'or' in a statute indicates an intention to use it disjunctively so as to designate alternative or separate categories." *White*, 31 Cal. 3d at 680. In focusing solely on Emerson's ability to "correct" a potential violation of law, the court erred by ignoring evidence of Emerson's authority as a manager to "investigate" or "discover" alleged noncompliance of law by the client or his own company.

violation of law.  The jury instruction provides in relevant part:

> [That [[*name of plaintiff*] disclosed/[*name of defendant*] believed that [*name of plaintiff*] [had disclosed/might disclose]] to a [government agency/law enforcement agency/person with authority over [*name of plaintiff*]/ [or] an employee with authority to investigate, discover, or correct legal [violations/noncompliance]] that [*specify information disclosed*];]

Judicial Council of California Civil Jury Instruction 4603 (2021 ed.).  *See* Cal. R. Ct. 2.1050(a) ("California jury instructions approved by the Judicial Council are the official instructions for use in the state of California.").  In addition, a leading commentator on California law explains that an employer may not prohibit an employee from disclosing information about a potential violation of law "to a person with authority over the employee, *or to* another employee who has authority to investigate, discover, or correct a violation or noncompliance[.]"  3 B.E. Witkin, Summary of California Law, Agency & Employment § 373 (11th ed. 2022) (emphasis added).  Other California treatises are in accord.  *See* 1 Ming W. Chin et al., Cal. Practice Guide: Employment Litigation ¶ 5:1747 (The Rutter Group 2022).

The California Supreme Court's description of section 1102.5(b) in *Lawson* is also illuminating.  The court explained that section 1102.5(b) protects employees who share "information the employee 'has reasonable cause to believe . . . discloses a violation of state or federal statute' or of 'a local, state, or federal rule or regulation' with a government agency, with a person with authority over the employee, *or with* another employee who has authority to

investigate or correct the violation." *Lawson*, 12 Cal. 5th at 709 (emphasis added) (ellipsis in original). While the *Lawson* court was addressing a different question about the proper framework for evaluating section 1102.5 claims, *id.* at 712, the distinction it draws between disclosures to government agencies, persons with authority over the whistleblower, or other employees with authority to investigate or correct the violation, lends further support to a reading of the statute that makes these avenues of disclosure independent of one another.

Finally, such a construction is consistent with the broad remedial purpose of the California Whistleblower Protection Act. Section 1102.5 "reflects the broad public policy interest in encouraging workplace whistle-blowers to report unlawful acts without fearing retaliation." *Green v. Ralee Eng'g Co.*, 19 Cal. 4th 66, 77 (1998). When first enacted in 1984, the whistleblower statute provided protection only for employees who reported suspected violations of law to outside government or law enforcement agencies. *Id.* at 76-77. In 2014, the California Legislature amended section 1102.5(b) to protect employees from retaliation against disclosure to "a person with authority over the employee or another employee who has the authority to investigate, discover, or correct the violation" as well as retaliation "for providing information to, or testifying before, any public body conducting an investigation, hearing or inquiry." 2013 Cal. Stats., ch. 577, § 5.5 (S.B. 666); ch. 732, § 6.5 (Assemb. B. 263); ch. 781, § 4.1 (S.B. 496). As amended, section 1102.5(b) further clarified that employee disclosures were protected "regardless of whether disclosing the information is part of the employee's job duties." *Id.* Other amendments were made concurrently to the California Business and Professions Code, Labor Code, and Government Code. *Id.* Senate Bill 496 was intended to "clarif[y] rights and procedures under the California Whistleblower Protection

Act and related laws, codifying case law regarding court review and more explicitly setting forth administrative and judicial processes, and updating related whistleblower protections against retaliation." Cal. Assemb. Comm. on Judiciary, Analysis of S.B. No. 496 as amended June 11, 2013 (2013-2014 Reg. Sess., June 25, 2013), p. 1.

Given the context of the 2014 statutory amendments and its expansion of protections and remedies for whistleblowers across several code provisions, the district court's constricted reading of section 1102.5(b) cannot stand. Providing independent avenues for employees to disclose potential violations of law serves the "broad public policy interest in encouraging workplace whistle-blowers to report unlawful acts without fearing retaliation." *Green*, 19 Cal. 4th at 77. A person "with authority" over the whistleblower is in a managerial position with the ability to act on that information. There may however be other employees within an organization, such as an ombudsperson, human resources personnel, or a complaint hotline staff, who do not supervise the whistleblower yet may possess "authority to investigate, discover, or correct the violation." *See, e.g., Lawson*, 12 Cal. 5th at 708 (noting the plaintiff "filed two anonymous complaints with [the defendant's] central ethics hotline"). To combine these two channels of protected disclosure is to artificially circumscribe meaningful ways that potential wrongdoing can be elevated and addressed.

For the foregoing reasons, we predict that the California Supreme Court would hold that section 1102.5(b) prohibits employers from retaliating against employees who disclose potential wrongdoing to any one of several enumerated avenues: government or law enforcement agencies, a person with authority over the employee, other employees with authority to investigate, discover, or correct the violation or noncompliance, or any public body conducting an

investigation, hearing, or inquiry. Cal. Lab. Code § 1102.5(b). An employer may not retaliate against an employee when the employee "has reasonable cause to believe that the information discloses a violation of state or federal statute" or of "a local, state, or federal rule or regulation, regardless of whether disclosing the information is part of the employee's job duties." *Id.; see Lawson*, 12 Cal. 5th at 709. Accordingly, we proceed on the understanding that under California law, an employee disclosing information he or she reasonably believes to be a violation of law to a "person with authority over the employee" is a protected disclosure under section 1102.5(b).

As the district court found, Emerson was a person "with authority over [Killgore]" as his supervisor at SpecPro. Indeed, Emerson exercised that authority by terminating Killgore's employment. Killgore testified that he discussed the legality of the Conroe EA with Emerson. He stated that the SpecPro team did not have sufficient information about the prior helicopter operations to complete the environmental assessment accurately. He expressed concern that the team was not permitted to request environmental reports detailing the history of the Conroe parcels or to visit the Conroe site to observe its actual conditions. He told Emerson that the Army Reserve's instruction not to consider or report on the prior operations in the Conroe EA or even discuss these activities in email correspondence with the Army Reserve constituted "multiple violations" of NEPA. After these disclosures, Killgore was fired from SpecPro.

Because the district court wrongly concluded that disclosures to Emerson were not protected under the whistleblower statute, it did not consider this evidence in ruling on SpecPro's motion for summary judgment. Viewing such evidence in the light most favorable to the nonmoving party, we conclude that the evidence creates a

genuine dispute of material fact as to whether SpecPro retaliated against Killgore for engaging in protected whistleblower activity.[3]

**B.**

The district court also disregarded Killgore's disclosures to Chief Caballero for two reasons: disclosing potential violations to Chief Caballero was not a protected activity because it was a part of his "normal duties" of his employment, and Killgore's disclosures were unprotected because Chief Caballero was assertedly a "wrongdoer" in the alleged noncompliance with NEPA. Both determinations rest on a misapplication of California law.

As an initial matter, the district court presumed, without explaining why, that Chief Caballero was Killgore's supervisor with authority over him. The record does not support that supposition. Chief Caballero was an employee of the 63rd Command of the Army Reserve and was SpecPro's client. There is no evidence that Chief Caballero had the right to hire, fire, or otherwise direct Killgore's conditions of employment at SpecPro, and she affirmatively disclaimed any such authority. Chief Caballero was, however, an employee of a "government agency," the U.S. Army Reserve. Killgore's disclosures to her are properly understood as a disclosure to a "government agency" under the plain language of the statute. Cal. Lab. Code § 1102.5(b).

---

[3] We address the district court's determination that Killgore did not have reasonable cause to believe that federal law was violated below.

The district court concluded that Killgore's discussions with Chief Caballero of potential violations of law[4] were not entitled to whistleblower protection because reporting NEPA violations were part of his "normal duties" as her supervisee.  As discussed above, however, section 1102.5(b) was amended in 2014 to provide that a whistleblower's disclosures are protected "regardless of whether disclosing the information is part of the employee's job duties."  Cal. Lab. Code § 1102.5(b).  Even if the district court were correct that Killgore's reports to Chief Caballero were a normal function of his employment, his disclosures were clearly protected under state law at the time they were made.

The district court, relying on *Mize-Kurzman v. Marin Community College District*, 136 Cal. Rptr. 3d 259 (Ct. App. 2012), also determined that Killgore's communications with Chief Caballero were unprotected because the information was already known to her.  *Id.* at 281-82.  *Mize-Kurzman* held that an "employee's report to the employee's supervisor about the supervisor's own wrongdoing is not a 'disclosure' . . . because the employer *already knows* about his or her wrongdoing."  *Id.* at 282 (emphasis in original).  *Mize-Kurzman's* determination that disclosures to a wrongdoer do not qualify for protection was based on a Federal Circuit Court opinion interpreting the federal Whistleblower

---

[4] Killgore testified that he and Russ specifically told Chief Caballero that preparing the environmental assessment without reference to the prior helicopter operations was illegal under NEPA.  Chief Caballero testified that she did not recall Killgore bringing up the legality of excluding the prior operations.  Drawing all inferences in favor of the nonmoving party, we assume that Killgore specifically disclosed that he believed preparing the Conroe EA without reference to past activities would violate NEPA.

Protection Act.  *Id.* at 279-80, 281-82 (citing *Huffman v. Off. of Pers. Mgmt.*, 263 F.3d 1341, 1350 (Fed. Cir. 2001)).

The district court's reliance on *Mize-Kurzman* was inapt because, as discussed above, there is no evidence that Chief Caballero was Killgore's "employer" or "supervisor." Nothing in *Mize-Kurzman* suggests that its rule limiting protected disclosures to supervisors not involved in the alleged wrongdoing should be extended to individuals who do not supervise or employ the whistleblower.  *See id.* at 281-82.  Even if such a rule can be gleaned from *Mize-Kurzman*, several other state appellate courts have held that disclosures to wrongdoers *are* protected under section 1102.5(b).

In *Jaramillo v. County of Orange*, 133 Cal. Rptr. 3d 751 (Ct. App. 2011), the appellate court found that Jaramillo's disclosure to a supervisor involved in the wrongdoing was protected because it "fits within the literal definition of whistleblowing under Labor Code section 1102.5."  *Id.* at 762.  The court rejected the County's reliance on *Huffman*, stating that "California precedent is to the direct contrary." *Id.* at 762 (citing *Gardenhire v. Hous. Auth.*, 101 Cal. Rptr. 2d 893 (Ct. App. 2000)); *see also Hager v. Cnty. of L.A.*, 176 Cal. Rptr. 3d 268, 277 (Ct. App. 2014) (finding *Huffman* inconsistent with California law and holding that "a report of wrongdoing by a public employee to the very person who is engaged in the wrongdoing is covered by [section 1102.5(b)]"), *disapproved on other grounds in Lawson*, 12 Cal. 5th at 711-12.  Finally, *Huffman* has itself been superseded by amendments to the federal Whistleblower

Protection Act which protect employee disclosures to a supervisor believed to be involved in the wrongdoing.[5]

We conclude that the district court misapplied California law when it rejected evidence of Killgore's disclosures to Chief Caballero on the basis that reporting was part of his normal job duties or because she was assertedly involved in the wrongful conduct. Viewing the evidence in the light most favorable to his claims, Killgore has raised genuine issues of material fact as to whether he disclosed potential violations of law to Chief Caballero and whether such disclosures were a contributing factor in his termination in violation of state law.

## C.

The final question we must address concerning the section 1102.5(b) claim is whether Killgore "ha[d] reasonable cause to believe that the information discloses a violation of . . . federal statute" or "noncompliance with a . . . federal rule or regulation." Cal. Lab. Code § 1102.5(b). Under the statute, the relevant inquiry is not whether the conduct "actually violated" any specific statute or regulation, but whether the plaintiff "*reasonably believed that there was a violation of a statute, rule, or regulation*" at the time it was reported. *Nejadian v. Cnty. of L.A.*, 253 Cal. Rptr. 3d 404, 418 (Ct. App. 2019) (emphasis in original)

---

[5] *See* Whistleblower Protection Enhancement Act of 2012, Pub. L. No. 112-199, § 101(b)(2)(C), 126 Stat. 1465, 1466 (2012) (codified as amended at 5 U.S.C. § 2302(f)(1)) ("A disclosure shall not be excluded from subsection (b)(8)"—forbidding retaliation against an employee who discloses information about a suspected "violation of any law, rule or regulation"—because "(A) the disclosure was made to a supervisor or to a person who participated in an activity that the employee . . . reasonably believed to be [a violation of law, rule, or regulation].").

(contrasting the requirements of section 1102.5(b) and 1102.5(c) retaliation claims).

**1.**

To determine whether Killgore presented triable evidence sufficient to support a reasonable belief that NEPA was being violated in the preparation of the Conroe EA, we begin by summarizing the requirements of NEPA and its implementing regulations.

NEPA is a procedural statute that requires a federal agency like the Army Reserve "to assess the environmental consequences of their actions before those actions are undertaken." *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 993 (9th Cir. 2004). "NEPA 'ensures that the agency . . . will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger [public] audience.'" *Blue Mountains Biodiversity Project v Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998) (alterations in original) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989)). NEPA is accompanied by implementing regulations promulgated by the Council on Environmental Quality ("CEQ"), 40 C.F.R. §§ 1501.1-1508.28.

For "major Federal actions significantly affecting the quality of the human environment," the agency must prepare an environmental impact statement ("EIS"). 42 U.S.C. § 4332(2)(C). "Where an agency is unsure whether an action is likely to have 'significant' environmental effects, it may prepare an EA: a 'concise public document' designed to '[b]riefly provide sufficient evidence and analysis for determining whether to prepare an [EIS] . . . .'" *Klamath-*

*Siskiyou*, 387 F.3d at 993 (first alteration in original) (quoting former 40 C.F.R. § 1508.9); *see also* 40 C.F.R. § 1501.5(c)(1).

Under the CEQ regulations, the EA must "[b]riefly discuss the purpose and need for the proposed action" and alternatives and "the environmental impacts of the proposed action and alternatives," 40 C.F.R. § 1501.5(c)(2), and it must consider the "[e]ffects or impacts" of a proposed action, 40 C.F.R. § 1508.1(g). Pertinent to our analysis here, the NEPA regulations require consideration of the cumulative impacts of an action, defined as "effects on the environment that result from the incremental effects of the action when added to the effects of other past, present, and reasonably foreseeable actions." *Id.* § 1508.1(g)(3).

The district court concluded that Killgore could not have reasonably believed that omission of the prior helicopter operations from the Conroe EA was a violation of NEPA and its regulations because the EA is a "forward looking" document that "need only assess the potential impacts of the proposed action." The court rejected Killgore's reliance on *Klamath-Siskiyou*, holding that federal agencies "have substantial discretion over whether to include *past* actions in their EAs and what extent those past actions should be discussed in a cumulative effects analysis." The district court misconstrued our holding in *Klamath-Siskiyou*.

As we previously explained, "[a] proper consideration of the cumulative impacts of a project requires some quantified or detailed information; . . . general statements about possible effects and some risk do not constitute a hard look absent a justification regarding why more definitive information could not be provided." *Klamath-Siskiyou*, 387 F.3d at 993 (internal quotation marks and citations omitted). We emphasized that a cumulative impacts analysis "must be

more than perfunctory; it must provide a useful analysis of the cumulative impacts of *past, present, and future projects*." *Id.* at 994 (emphasis added); *see id.* at 996 (reversing grant of summary judgment in NEPA action challenging timber sales where agency's EAs gave only "generalized" and "conclusory" statements about cumulative effects of proposed sales); *see also* 40 C.F.R. § 1508.1(g)(3) (a cumulative impacts analysis under NEPA reviews the "effects on the environment that result from the incremental effects of the action *when added to the effects of other past, present*, and reasonably foreseeable actions." (emphasis added)).

The district court's assertion that the EA is only a "forward looking" document that need not consider prior activity in evaluating the potential impacts of a proposed action is contradicted by the CEQ regulations and our precedent. While the district court is correct that federal agencies have substantial discretion to define the scope of NEPA review, an agency may not disregard its statutory obligation to take a "hard look" at the environmental consequences of a proposed action, including its cumulative impacts, where appropriate. *Blue Mountains*, 161 F.3d at 1212, 1214-15.

As Killgore's testimony and evidence identified, the Conroe EA provided no analysis or discussion of the prior helicopter activities. Killgore testified that he believed that consideration of this prior activity was important for an evaluation of the proposed action because prior helicopter missions had been occurring for more than ten years, and yet there was little to no documentation of their environmental effects on the Conroe site. Killgore believed that there may have been prior refueling missions, which required consideration of potential oil spills, the introduction of invasive species, soil erosion, and other environmental

impacts.  Even if prior helicopter missions only involved low-level hovering missions, the cumulative effect of these prior activities, when combined with the proposed assault helicopter landing zone operations, could have a significant effect on the environment.  *See* 40 C.F.R. § 1508.1(g)(3) ("Cumulative effects can result from individually minor but collectively significant actions taking place over a period of time.").

The district court erred in determining, as a matter of law, that Killgore had no reasonable cause to believe that they were violating NEPA by failing to consider and include the prior helicopter operations in the Conroe EA.  At a minimum, this was a question of fact for the jury to decide. *See Terry v. Atl. Richfield Co.*, 140 Cal. Rptr. 510, 512 (Ct. App. 1977) ("[T]he reasonableness of an act or omission is a question of fact, that is, an issue which should be decided by a jury and not on a summary judgment motion," unless "there is no room for a reasonable difference of opinion."); *West v. State Farm Fire & Cas. Co.*, 868 F.2d 348, 350 (9th Cir. 1989) (per curiam) (citing *Terry*, supra).  As the record demonstrates, both Burger and Russ also believed it was important to reference the prior helicopter training missions in the Conroe EA, and Russ shared the view that omitting this information was "unethical and probably illegal" because they were not being fully transparent with the public.  That other members of the SpecPro team may have also believed they were violating federal law illustrates that the reasonableness of Killgore's disclosures of illegality was a factual matter better left for the jury.

**2.**

Two final matters bear some discussion.  The district court accepted SpecPro's contention that Killgore alleged a violation of NEPA because the team was required to

complete the Conroe EA in only three months. To the extent Killgore is alleging that a rushed timeline is itself a violation of NEPA, we agree with the district court that concern about meeting a deadline is not a protected activity. However, we view Killgore's testimony about the three-month deadline not in a vacuum, but in the broader context of his testimony about the absence of documentation about the prior helicopter activities, the complexity of the Conroe EA in light of the prior operations, and the limitations imposed by the Army Reserve in prohibiting the SpecPro team from pulling environmental reports or traveling to the site to observe its actual conditions. Viewing the evidence in the light most favorable to Killgore's claims, as we must, his concern about the inability to meet the three-month deadline reflected a broader concern that the team was being forced to prepare a noncompliant and incomplete report that unlawfully excluded the prior helicopter operations. The reasonableness of his belief is a factual question for the jury to determine.

At oral argument, SpecPro also asserted that Killgore could not have reasonably believed there was a violation of NEPA because such violation can only occur when the environmental assessment is signed, and Killgore was fired before the Conroe EA had been completed. This argument is contradicted by the plain language of the statute and the purpose for which whistleblower protections were enacted in California. An employer may not retaliate against an employee for disclosing wrongful conduct "or because the employer *believes* that the employee disclosed *or may disclose* information" about a violation of law. Cal. Lab. Code § 1102.5(b) (emphasis added); *see also* Cal. Assemb. Comm. on Judiciary, Analysis of S.B. No. 496 as amended June 11, 2013 (2013-2014 Reg. Sess., June 25, 2013), p. 3. ("[C]omplaints about alleged violations of local law are covered, as well as internal complaints and perceived or

anticipatory retaliation."). Section 1102.5(b) serves to protect actual disclosures as well as retaliation for anticipated whistleblowing activity. SpecPro's reading of the statute would allow an employer to fire the potential whistleblower *before* completing the illegal act and thereby escape liability. California law does not limit whistleblower protections in such manner.

We conclude that Killgore's disclosures to Emerson and Chief Caballero were protected under section 1102.5(b), and he raised genuine issues of material fact as to what illegal conduct he disclosed, whether he had reasonable cause to believe that federal law was being violated, and whether his whistleblowing activity was a contributing factor in his termination of employment. Accordingly, we reverse the district court's summary judgment order of the section 1102.5(b) retaliation claim. Because his claim of wrongful termination in violation of public policy is derivative of his retaliation claim, we reverse the grant of summary judgment as to that claim as well.

**IV.**

Section 1102.5(c) prohibits "[a]n employer . . . [from] retaliat[ing] against an employee for refusing to participate in an activity that would result in a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation." "[T]o prevail on a claim under this provision, the plaintiff must identify both the specific activity and the specific statute, rule or regulation at issue; the court must then determine the legal question whether the identified activity would result in a violation or noncompliance with the identified statute, rule, or regulation, and, if so, the jury must determine the factual issue whether the plaintiff was retaliated against for refusing

to participate in the identified activity." *Nejadian*, 253 Cal. Rptr. 3d at 408.

The district court granted summary judgment after finding that Killgore presented no evidence he had refused to engage in illegal activity. We agree. While Killgore raised extensive concerns about the report, no evidence has been adduced that he refused to comply with Chief Caballero's directives concerning the Conroe EA or otherwise refused to complete the EA. Rather, he testified that he did not get a chance to refuse to work on the project before he was fired, and he continued working on the document until his final day at SpecPro. We affirm the district court's order granting summary judgment on this claim.

## V.

Because Killgore has presented genuine disputes of material fact under section 1102.5(b) and wrongful termination in violation of public policy, we reverse the district court's order granting summary judgment of those claims and remand for further proceedings consistent with this opinion. We affirm the grant of summary judgment as to the section 1102.5(c) claim.

**AFFIRMED in part, REVERSED in part, and REMANDED. Defendant-Appellee must bear all costs.**